**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* DANIEL FOSTER, <br><br> Plaintiff-Relator, <br><br> vs. <br><br> TCC INTERNATIONAL LLC d/b/a CORE: CLUB; CORE CLUB MEMBERS CORP; and CORE: GRAVITY LLC, <br><br> Defendants. | Case No. _____ <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> **<u>FALSE CLAIMS ACT *QUI TAM* COMPLAINT</u>** <br><br> **<u>UNDER SEAL</u>** <br> **Pursuant to 31 U.S.C. § 3730(b)(2)** |

## <u>INTRODUCTION</u>

1.     *Qui tam* relator, Daniel Foster ("Relator"), brings this action on his own behalf and on behalf of the United States of America to recover civil damages and penalties under the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*  Relator brings this action against Defendants TCC International LLC d/b/a CORE Club, CORE Club Members Corp, and CORE: Gravity LLC (collectively, "Defendants" or "CORE Entities").

2.     Relator's allegations concern the illegal applications for and receipt of government funds by Defendants in their applications for relief under the Paycheck Protection Program (PPP) and the Restaurant Revitalization Fund (RRF).

3.     In summary, upon information and belief, beginning in April 2020, Defendants applied for and received forgiveness of two PPP loans for which, as an invitation-only private members club, the CORE Entities were ineligible. Additionally, upon information and belief, Defendants applied for an RRF grant for which the CORE entities were ineligible.

4.      Defendants knowingly, willfully, and intentionally applied for funds for which the CORE Entities knew they were ineligible.

5.      Defendants knowingly, willfully, and intentionally applied for two PPP loans and one RRF grant using three different names and entities for each application, giving the appearance that the applications were unrelated.  In doing so, Defendants made misrepresentations about the CORE Entities' business structure to the Small Business Administration ("SBA") that obfuscated their ineligibility for, and increased the amount of, relief funds they received.

6.      Upon information and belief, the CORE Entities were created to support one umbrella entity, the CORE Club, which is an invitation-only private members club located in New York City.

7.      By presenting applications and receiving funds under the PPP and RRF programs while the CORE Entities knew or should have known that these applications were not allowed under applicable laws and regulations, Defendants violated the FCA.

## FEDERAL JURISDICTION AND VENUE

8.      This action arises under the laws of the United States to redress violations of the FCA.  Subject-matter jurisdiction is conferred over these causes of action by 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 31 U.S.C. § 3732.

9.      The Court has personal jurisdiction over Defendants under 31 U.S.C. § 3732(a), which provides that actions under the FCA "may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by" the FCA occurred.  During the relevant time period, Defendants resided and transacted business in this District.

10.     Venue lies under 28 U.S.C. § 1391(b), and 31 U.S.C. § 3732(a) because Defendants transact business and reside within this District.  Venue is also appropriate because substantial information supporting the allegations herein is located in this District.

11.     To the extent, if any, that this case is deemed to be a "related action" and to the extent, if any, that facts set forth herein are deemed to be the same as facts underlying an existing *qui tam* FCA action pending at the time of the filing of this action, as set forth in 31 U.S.C. § 3730(b), said factual allegations in common with any pending action that would cause this case to be a "related action" are hereby expressly excluded from this action, but only to the limited extent necessary to avoid the statutory preemption.

12.     Furthermore, to the extent that the allegations or transactions set forth herein are the subject of civil suit or an administrative civil money penalty proceeding in which the United States is already a party, if any such proceedings exist, then the allegations or transactions referred to herein, which are the subject of any such civil suit or administrative civil penalty proceedings are expressly excluded, but only for the specific time periods, specific companies, and/or specific allegations or transactions that are already the subject of the civil suit and/or administrative civil money penalty proceeding.

13.     The facts and circumstances of the Defendants' violation of the FCA have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office or Auditor General's report, hearing, audit, or investigation, or in the news media.

14.     To the extent there has been a public disclosure unknown to Relator, he is an "original source" within the meaning of 31 U.S.C. §3730(e)(4)(B).

15.     Pursuant to 31 U.S.C. § 3730(b)(2), immediately upon filing this Complaint, Relator will provide the Attorney General with a copy of the Complaint and written disclosure of substantially all material evidence and information in his possession. Defendants' illegal conduct alleged herein began in or about April 2020 and, on information and belief, continued until on or about March 11, 2023.

## PARTIES

16.     Relator Daniel Foster is a resident of New York City, New York, United States, and Berlin, Germany. Relator's residence within the United States, includes territory subject to the jurisdiction of the United States District Court for the Southern District of New York.

17.     Relator is a former member of a similar private members club in New York, Soho House. This experience gives him inside knowledge of how these organizations operate, including their membership policies and business practices.

18.     Relator is the founder of a legal technology company specializing in intellectual property theft detection and management. In that role, he has gained extensive experience in digital investigations, evidence gathering, and corporate fraud.

19.     Relator also holds a Wine & Spirits Education Trust Level 2 certification, providing him with specialized knowledge of the food and drink industry.

20.     Relator used his digital investigative skills to uncover archive data information and documents related to Defendants, including the CORE: Constitution, which explicitly states that CORE Club is an invitation-only private members club.

21.     Relator obtained documents showing that Defendants operate an invitation-only private members club. These materials contradict representations Defendants made to the government that they operate a restaurant open to the public.

22.     Relator's investigative experience helped identify links in a convoluted corporate structure, which includes Defendants' use of varying entity names, misleading classifications and alternating spellings of its business address. It is highly probable that had Relator not discovered these associations, both the existence and extent of the fraud would remain undetected.

23.     Relator brings these claims at potential great personal cost. As a successful technology founder, Relator's status as a known whistleblower will effectively make him an outcast in the business community. Relator is unlikely to be invited to serve in any management or board role in the future. Relator jeopardizes his ability to receive venture capital funding for any future ventures, severely limiting his career prospects as an entrepreneur.

24.     The United States is a real party in interest under the FCA and ultimately paid the false claims alleged herein and is entitled to the full recovery of funds sought by this action. The U.S. Small Business Administration (SBA) is an independent agency of the federal government that was given authority through legislation enacted in response to the COVID-19 Public Health Emergency, to provide loans and grants, such as the ones at issues in this action, to qualified small businesses so that they could keep afloat during the COVID-19 pandemic.

25.     Defendant TCC International LLC d/b/a CORE Club is a Delaware limited liability corporation, with its business operations located at 66 E. 55th Street, New York, New York 10022.  In or about September 2023, CORE Club moved to its new headquarters located at 711 Fifth Avenue, New York, New York.

26.     Defendant CORE Club Members Corp. is a New York not-for-profit corporation with its business operations located at 66 E. 55th Street, New York, New York.

27.     Defendant CORE: Gravity LLC (CORE Gravity), is a Delaware limited liability company and a self-described sole proprietorship, located at 66 E 55th Street, New York, New York.

## LEGAL AND REGULATORY BACKGROUND

**A.     The Federal False Claims Act**

28.     The FCA prohibits the knowing presentment, making, use, or causation of a false or fraudulent claim for payment, or record or statement within a claim for payment, or who conspires to commit such a knowing act. 31 U.S.C. § 3729(a)(1). A person or entity violating the FCA is liable for civil penalties, subject to exceptions and adjustments; treble damages for harm sustained by the United States attributable to the fraud; and the costs of the civil action brought to recover penalties or damages. *Id.* § 3729(a)(1), (3).

29.     The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest[.]" *Id.* § 3729(b)(2)(A)(i)–(ii).

30.     As set forth in the FCA, "knowing" means that a person has actual knowledge of the information or acts in willful ignorance or reckless disregard of the truth or falsity of the information submitted. The United States need not show that the person or entity held a specific intent to defraud. *Id.* U.S.C. § 3729(b)(1).

31.     The FCA provides that the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

32.     The standard of proof under the FCA is preponderance of the evidence. 31 U.S.C. § 3731(d).

### B.  The Paycheck Protection Program (PPP)

33.     The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act") was enacted on March 27, 2020, and was designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.  The SBA received funding and authority through the CARES Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency.

34.     The CARES Act appropriated $349 billion to be used as loans to eligible small business struggling to pay employees and other business expenses as a result of the devastating effects of the COVID-19 pandemic.

35.     Section 1102 of the CARES Act temporarily permitted the SBA to guarantee 100 percent of 7(a) loans under a new program called the "Paycheck Protection Program" ("PPP").

36.     On April 24, 2020, the Paycheck Protection Program and Heath Care Enhancement Act (Pub. L. 116-139) became law and provided additional funding and authority for the PPP. On June 5, 2020, the Paycheck Protection Program Flexibility Act of 2020 (Flexibility Act) (Pub. L. 116-142) became law and changed key provisions of the PPP, including provisions relating to the maturity of PPP loans, the deferral of PPP loan payments, and the forgiveness of PPP loans.

37.     Under the PPP in 2020, eligible businesses could obtain one SBA guaranteed loan. Businesses were required to spend loan proceeds on employee compensation, rent or mortgage,

and other specified expenses and, depending on their use of the loan proceeds, could qualify for loan forgiveness, up to the full amount of the loan.

38.     In April 2020, the SBA announced that businesses identified in 13 CFR § 120.110 are not eligible for PPP loans. The regulation specifically mentions in section (i) that "[p]rivate clubs and businesses which limit the number of memberships for reasons other than capacity" are ineligible.

39.     The SBA delegated authority to third-party lenders to underwrite and approve the PPP loans. In order to obtain a PPP loan, a qualifying business (through its authorized representative) signed and submitted a PPP loan application (SBA Form 2483) online through the lender's application platform. The PPP loan application required the business to acknowledge the PPP program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. *See* PPP Borrower Application Form, SBA Form 2483, Version 1 (eff. Apr. 2, 2020) at https://www.sba.gov/document/sba-form-2483-ppp-first-draw-borrower-application-form (last accessed Nov. 1, 2023).

40.     Among the certifications the applicant had to make included:

- "The applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule)." *Id.*

- "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; **I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud**." *Id.* (emphasis added).

- "**I further certify that the information provided in this application** and the information provided in all supporting documents and forms **is true and accurate in all material respects**. **I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under**

**the law** including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a find or not more than $5,000; **and, if submitted to a federal insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a find or not more than $1,000,000**." *Id.* (emphasis added).

41.    Once the borrower submitted its PPP loan application to a participating lender, the lender processed the loan application. If a PPP loan application was approved by the lender, it thereafter funded the PPP loan using its own monies, which were 100% guaranteed by the SBA.

42.    After the lender processed and approved a borrower's PPP loan application, but prior to the closing of the PPP loan, the lender submitted to the SBA the "Lender's Application – Paycheck Protection Program Loan Guaranty" (SBA Form 2484) applying for a guarantee on the loan. For a PPP loan to be approved, the lender was required to answer "yes" to Section F of the form that "[t]he Applicant has certified to the Lender that the Applicant is eligible under the Paycheck Protection Rules." Lender Application Form - PPP Loan Guaranty, SBA Form 2484, Version 1 (eff. Apr. 3, 2020) at https://www.sba.gov/document/sba-form-2484-lender-application-form-paycheck-protection-program-loan-guaranty (last accessed Nov. 1, 2023).

43.    Therefore, if a PPP borrower lied on its PPP loan application, the PPP borrower's false certification caused the lender to submit to the SBA with respect to that PPP loan an application for a loan guarantee that contained the borrower's False Statement.

44.    The PPP loan program was funded again by the Consolidated Appropriations Act, 2021 (Pub. L. 116-260) for an additional $284 billion, and by the American Rescue Plan Act of 2021 (Pub. L. 117-2) for an additional $7 billion. These laws allowed businesses that did not obtain a PPP loan in 2020 to obtain one and allowed certain businesses that did receive a PPP loan in 2020 to obtain a second loan.

45.    The process for obtaining a second draw PPP loan was similar, however, potential borrowers would submit SBA Form 2483-SD to a lender. *See* PPP Borrower Application Form, SBA Form 2483-SD, Version 4 (eff. Mar. 18, 2021) at https://www.sba.gov/document/sba-form-2483-sd-ppp-second-draw-borrower-application-form (last accessed Nov. 1, 2023). Potential borrowers submitting an application for a PPP second draw loan make the same certifications contained in the PPP first draw loan. *See id.* If a PPP second draw loan application was approved by a participating lender, it thereafter funded the PPP loan using its own monies, which were 100% guaranteed by the SBA.

46.    Like with a first draw loan, once the borrower submitted its second draw PPP loan application, the lender processed and approved the application. Prior to the closing of the PPP second draw loan, the lender submitted to the SBA form 2484-SD applying for a guarantee on the loan. For a PPP loan to be approved, the lender was required to answer "yes" to Section F that "[t]he Applicant has certified to the Lender that the Applicant is eligible under the Paycheck Protections Rules." PPP Second Draw Lender Application Form, SBA Form 2484-SD, Version 3 (eff. Mar. 18, 2021) at https://www.sba.gov/document/sba-form-2484-sd-ppp-second-draw-lender-application-form (last accessed Nov. 1, 2023).

47.    Therefore, if a PPP borrower lied on its PPP loan application, the PPP borrower's false certification(s) caused the lender to submit to the SBA  a loan guarantee application for that PPP loan that contained the borrower's false certification(s).

**C.    The Restaurant Revitalization Fund (RRF)**

48.    The American Rescue Plan Act (Pub. L. 117-2) was enacted on March 11, 2021, which, like the CARES Act, was designed to provide emergency financial assistance to aid with the country's ongoing economic recovery during the pandemic. One source of relief provided by the American Rescue Plan Act was the authorization of up to $28.6 billion for the RRF, which was

a grant program to support restaurants and bars that suffered economic losses because of the pandemic. Each business was eligible for up to $5 million in assistance.

49.    The RRF allowed qualifying businesses to apply for grant funding related to their pandemic-related revenue losses. RRF proceeds were required to be used by businesses on payroll, mortgages, rents, debt service, utility payments, maintenance expenses, construction of outdoor seating, business supplies, business food and beverage expenses, covered supplier costs, or business operating expenses. The program required that any business that received a grant spend the proceeds on these expense items by March 11, 2023. Grants received through the RRF did not need to be paid back.

50.    Like with PPP, the RRF program was administered by the SBA. To apply for RRF grant funding, applicants could apply through a recognized SBA Restaurant Partner, through the SBA directly online, or over the phone.

51.    Eligible businesses included entities that were "not permanently closed and include[d] businesses where the public or patrons assemble for the primary purpose of being served food or drink." These businesses included restaurants, bars, inns and other similar venues. (RRF Program Guide, April 28, 2021).

52.    The SBA stated that "[t]o satisfy the statutory requirement for 'place of business in which the public or patrons assemble for the primary purpose of being served food or drink,' an eligible entity must have at least 33% in 2019 on-site sales to the public." *Id.*

53.    The SBA also stated that non-profit organizations are not eligible. *Id.* at 5.

54.    The SBA outlined how to calculate how much money a qualified business was eligible for under the RRF grant program, which included the instruction that any applicant must "[s]ubtract the aggregate original disbursement amount(s) of any PPP loan (First Draw PPP Loan

and Second Draw PPP Loan) received, regardless of whether received in 2020 or 2021. Do not include any amount that you repaid on or before May 18, 2020, in accordance with PPP safe harbor rules." *Id.* at 7.

55.    To apply for an RRF grant, a qualifying business (through its authorized representative) signed and submitted a RRF Funding Application (SBA Form 3172). The RRF loan application required the business to acknowledge the RRF program rules and make certain affirmative certifications in order to be eligible to obtain the RRF grant. *See* RRF Funding Application, SBA Form 3172, Version 2 (eff. Apr. 19, 2021) at https://www.sba.gov/document/sba-form-3172-restaurant-revitalization-funding-application-sample (last accessed Nov. 6, 2023).

56.    Among the certifications a borrower would have had to make included:

- "I understand that by signing this application and accepting RRF funds, I am agreeing that no later than the end of the covered period, **I will certify to SBA that the Applicant business used all funds only on eligible uses within the covered period**." *Id.* (emphasis added).

- "**I further certify that the information provided in this application** and the information provided in all supporting documents and forms **is true and accurate in all material respects**. **I understand that knowingly making a false statement to obtain a grant from SBA is punishable under the law**, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a find of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a find of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a find of not more than $1,000,000." *Id.* (emphasis added).

- "**The Applicant is eligible to receive funding under the rules in effect at the time this application is submitted**." *Id.* (emphasis added).

## BACKGROUND ON DEFENDANTS

57.    Each of the Defendant entities named in this matter relate to CORE Club, which is an elite invitation-only private members club in New York City founded in 2005.

58.     CORE Club was based at 66 E 55th Street in New York City until on or about September 2023. After this date, it moved one block west to 711 Fifth Avenue.

59.     CORE Club members are drawn from the financial and social elite of New York.

60.     An internal document for members, known as the "CORE: Constitution," states, *"All categories of membership are by invitation only."*

61.     From 2005 to 2021, CORE Club primarily conducted business through two entities:

    a.  **CORE Club Members Corp**: A New York not-for-profit entity that founding club members may hold shares in. This entity also operates the club's liquor license.

    b.  **TCC International LLC**: This is a Delaware corporation with a branch in New York. TCC International is listed in the entity details for CORE Club Members Corp.

62.     At a time unknown to Relator, the self-described sole proprietorship CORE Gravity became associated with CORE Club.

## DEFENDANTS' FRAUDULENT SCHEME

63.     Defendants have been and, on information and belief, were engaged in a scheme to submit claims for relief under the PPP and RRF programs.

64.     Defendants improperly applied for and received government funds totaling $4,608,762.50 through the PPP and RRF programs.

65.     In both PPP applications, Defendants ignored published guidelines from the SBA stating that private clubs that limit the number of memberships for reasons other than capacity are ineligible for these programs. 13 CFR § 120.110. As previously stated, in April 2020, the SBA announced that businesses that are not eligible for PPP loans are identified in 13 CFR § 120.110.

That regulation specifically mentions in section (i) that "[p]rivate clubs and businesses which limit the number of memberships for reasons other than capacity" are ineligible.

66.    For each PPP forgiveness application, Defendants falsely attested that "[t]he Borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness." Further, Defendants acknowledged that they understood that "if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges." (PPP Loan Forgiveness Application form 3508).

67.    Separate and apart from Defendants' ineligibility for PPP loans, Defendants were also ineligible for the RRF grant they ultimately obtained because the entity under which it applied – CORE Club Members Corp. – is a not-for-profit corporation. The RRF program rules exclude not-for-profit companies.

68.    To obtain an RRF grant, Defendants had to certify that "[t]he Applicant is eligible to receive funding under the rules in effect at the time this application is submitted."

69.    The RRF Program Guide at the time of Defendants' application specifically said that non-profit organizations are not eligible for RRF grants.

70.    Consequently, when CORE Club Members Corp. applied for an RRF grant, it falsely certified that it was eligible to receive funds.

71.    Defendants applied for two PPP loans and one RRF grant by using three different names and entities for each application; each was used to support the umbrella CORE Club organization.

**A.    The First PPP Loan**

72.    Upon information and belief, on April 10, 2020, CORE Club, using the name "CORE Gravity" received approval for a first draw PPP loan of $960,400 (loan number

KH794397.DOCX                    14

2560007100). The entity CORE Gravity had never been used in any prior business filings related to CORE Club.

73.    CORE Gravity falsely identified itself as a sole proprietorship when it should have identified itself as a corporation. *Id.*

74.    The loan applicant reported 74 employees. *Id*.

75.    CORE Gravity listed its business address as 66 E 55th St, the same address as CORE Club. *Id*.

76.    CORE Gravity chose the age category, "Startup, Loan Funds will Open Business," and business category, "Golf Courses and Country Clubs" on its application (NAICS code 713910).

77.    Although Relator does not possess a copy of CORE Gravity's final borrower application form submitted to its lender, CORE Gravity was required to certify to the truth and accuracy of the representations referenced in Paragraph 40 of this Complaint, the falsity of which is punishable by significant liability, fines, and imprisonment.

78.    On November 1, 2021, $453,033 of the $960,400 loan was forgiven. *Id*.

79.    CORE Gravity used the funding for CORE Club. As an invitation-only private members club, CORE Club was ineligible for a PPP loan under 13 CFR § 120.110.

80.    Upon information and belief, in submitting its PPP loan application, CORE Gravity falsely certified to the lender that it was eligible for a PPP loan, thereby causing the lender to submit its loan guarantee for this PPP loan to the government that was based on CORE Gravity's false certification.

**B.    The Second PPP Loan**

81.    On March 30, 2021, TCC International LLC received approval for a PPP loan of $1,344,675.50 (loan number 2618178704).[1]

82.    The loan applicant reported 74 employees, the same number as reported in the first PPP application submitted by CORE Gravity. *Id.*

83.    TCC International LLC used the same, albeit misspelled, address of "66E E 55th St." *Id.*

84.    TCC International LLC falsely identified itself as a sole proprietorship on the application. It should have classified itself as an LLC or corporation. *Id.*

85.    It chose the following business age category: "Existing or more than 2 years old." *Id.*

86.    TCC International LLC used the business category, "Full-Service Restaurants" on its application (NAICS code 722511). This is inconsistent with the application made by CORE Gravity, which used the business category "Golf Courses and Country Clubs."

87.    Although Relator does not possess a copy of TCC International LLC's final borrower application form submitted to its lender, TCC International LLC was required to certify to the truth and accuracy of the representations referenced in Paragraph 40 of this Complaint, the falsity of which is punishable by significant liability, fines, and imprisonment.

88.    On April 4, 2022, TCC International LLC received loan forgiveness on $1,358,085. *Id.*

---

[1] It does not appear that TCC International LLC received a first draw loan, however, raw data from the Small Business Administration indicates this was a second draw loan. If it was a first draw loan, Defendants would have had to falsely certify that they had not received another first draw loan.

89.     TCC International LLC used the funding for CORE Club. As an invitation-only private members club, CORE Club was ineligible for a PPP loan under 13 CFR § 120.110.

90.     Upon information and belief, in submitting its PPP loan application, TCC International LLC falsely certified to the lender that it was eligible for a PPP loan, thereby causing the lender to submit its loan guarantee for this PPP loan to the government that was based on TCC International LLC's false certification.

## C.     The Restaurant Revitalization Fund Grant (RRF)

91.     On May 25, 2021, CORE Club Members Corp was approved for a RRF grant totaling $2,303,687 (loan number 7536729001).

92.     CORE Club Members Corp represented itself under the categories "Restaurant" and "Corporation."

93.     However, CORE Club Members Corp is registered as a not-for-profit corporation. It holds a "members only" liquor license under the same name in the state of New York, which has a separate liquor license category for private clubs.

94.     The RRF program rules explicitly exclude non-profit corporations. The program rules also exclude establishments that do not serve food or drink to the public. Furthermore, the RRF program guide published by the SBA states, "[b]usinesses are ineligible if any of the provisions in 13 CRF § 120.110 applies." This would include invitation-only private members clubs.

95.     CORE Club Members Corp further failed "[t]o satisfy the statutory requirement for 'place of business in which the public or patrons assemble for the primary purpose of being served food or drink,' an eligible entity must have at least 33% in 2019 on-site sales to the public." ¶ 52, *supra*. Of course, CORE Club, who was the sole beneficiary of the RRF grant is a private members club which had 0% on-site sales to the public – in any year.

96.     The applicant listed a franchise name of "Green Restoration" on the application and registered the same franchise name with the SBA Franchise Directory.[2]

97.     Under the RRF program rules, PPP loans must be deducted from the RRF grant total.[3]

98.     Although Relator does not possess a copy of CORE Club Members Corp's final RRF Funding Application Form submitted to the SBA, CORE Club Members Corp was required to certify to the truth and accuracy of the representations referenced in Paragraph 56 of this Complaint, the falsity of which is punishable by significant liability, fines, and imprisonment. All such certifications were false.

## CAUSES OF ACTION

### COUNT I

**False or Fraudulent Claims (U.S.C. § 3729(a)(1)(A))**

99.     Relator incorporates by reference and re-alleges paragraphs 1-98 of this Complaint as if fully set forth herein.

100.    This is a claim for treble damages and civil penalties under the FCA, 31 U.S.C. § 3729(a)(1)(A).

101.    Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States government, false or fraudulent claims for payment or approval, in

---

[2] The franchise was registered on January 19, 2021.

[3] Relator was unable to ascertain whether any PPP loans previously received by the various entities were deducted from the RRF grant total for CORE Club Members Corp. Nonetheless, given that the CORE Entities applied for these three loans under different corporate entities, it is unlikely CORE Club Members Corp. listed the previous loans on the CORE Entities' RRF grant application.

violation of the FCA, 31 U.S.C. § 3729(a)(1)(A), specifically, that Defendants submitted false or fraudulent applications for its first and second draw PPP loans, and for its RRF grant.

102.    The United States Government, unaware of the material falsity of the claims made or caused to be made by the Defendants, approved, paid, and participated in payments made by the Government's fiscal intermediaries for the PPP loans and RRF grant that otherwise would not have been allowed.

103.    As a direct and proximate result of the false and fraudulent claims made by Defendants, the United States Government has been damaged, on information and belief, in the amount of at least $4.6 millon.

## COUNT II

### False Statements (31 U.S.C. § 3729(a)(1)(B))

104.    Relator incorporates by reference paragraphs 1-98 of this Complaint as if fully set forth herein.

105.    This is a claim for treble damages and civil penalties under the FCA, 31 § U.S.C. 3729 (a)(1)(B).

106.    Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, and/or to get the United States to pay or approve false claims, in violation of the FCA, 31 § U.S.C. 3729(a)(1)(B), and payment of those false or fraudulent claims by the United States was a reasonable and foreseeable consequence of those statements and actions.

107.    These records and statements that Defendants caused to be false included false certifications that Defendants were eligible for PPP loan disbursal, PPP loan forgiveness, and RRF grants, when in fact they were not.

108.    Defendants caused to be made or used, such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

109.    As a direct and proximate result of the false and fraudulent claims made by Defendants, the United States Government has been damaged, on information and belief, in the amount of at least $4.6 million.

### PRAYER FOR RELIEF

WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendants by acting as follows:

a) Granting permanent injunctive relief to prevent any recurrence of violating the FCA, 31 U.S.C. §§ 3729, *et seq.*, for which redress is sought in this Complaint;

b) Awarding to the United States of America three times the amount of damages it sustained due to the false claims and fraud alleged in the foregoing paragraphs;

c) Awarding to the United States of America the maximum civil penalty for each violation of 31 U.S.C. § 3729;

d) Awarding pre- and post-judgment interest, costs, and expenses of litigation including reasonable attorneys' fees which the Relator necessarily incurred in filing and advancing this action pursuant to 31 U.S.C. § 3730(d);

e) Awarding to Relator the maximum relator's share amount allowed to him under the FCA, 31 U.S.C. § 3730(d), based upon the total value recovered, both tangible and intangible, including any amounts recovered from individuals and entities not party to this action;

f)   Enjoining Defendants from concealing, removing, encumbering, or disposing of assets which may be required to pay damages, penalties, fines, attorneys' fees and costs awarded by the Court; and

g)   Awarding such other and further relief as it deems proper.

//

//

//

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

DATED:  November *16*, 2023

By: _____

Rolando G. Marquez (NY Bar No. 4321311)
   (Of Counsel to Kirk Chapman Law LLC)
Kirk Chapman (NY Bar No. 2425650)
**KIRK CHAPMAN LAW LLC**
415 East 37th Street, #29K
New York, New York 10016
Tel:   (917) 951-0391
rolandomarquez@aol.com
kirkchapmanlaw@gmail.com

*Local Counsel for Plaintiff-Relator*
*Daniel Foster*

Zahra S. Karinshak (GA Bar No. 407911)
John F. Cartwright (DC Bar No. 1673557)
**KREVOLIN & HORST, LLC**
1201 W. Peachtree Street, N.W.
Suite 3250, One Atlantic Center
Atlanta, GA  30309
Tel:   (404) 888-9700
Fax:  (404) 888-9577
Karinshak@khlawfirm.com
Cartwright@khlawfirm.com

*Lead Counsel for Plaintiff-Relator*
*Daniel Foster*